**Paul M. Black**
**Bankruptcy Judge, Western District of Virginia**

**Dated: November 19th, 2020**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### PARKERSBURG DIVISION

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | **Chapter 11** |
| **1230 SOUTH ASSOCIATES, LLC** | ) | |
| | ) | **Case No. 19-60158** |
| **Debtor.** | ) | |

## MEMORANDUM OPINION

This matter is before the Court on United Bank's Motion to Dismiss (the "Motion") the Chapter 11 case filed by the Debtor, 1230 South Associates, LLC (the "Debtor"). United Bank ("United" or "the Bank") asks the Court to dismiss this case for "cause" pursuant to Section 1112(b) of the Bankruptcy Code. The Debtor filed a response to the Motion and a hearing was held on April 22, 2020. After the hearing, the parties filed additional briefs and responses, and the case was assigned to the undersigned on October 6, 2020.[1] At a telephone conference on October 28, 2020, the parties requested a ruling on the record and the briefs and the Court took the matter under advisement. Based on the evidence presented at the hearing and on the record

---

[1] United States Bankruptcy Judge Paul M. Black, Western District of Virginia, sitting by designation.

of this proceeding, the Court finds that "cause" exists to dismiss the case.[2]  Accordingly, the Court will grant the Motion.

## FACTUAL BACKGROUND

The facts are largely uncontested.  Michael Romine ("Romine") formed Specialty Piping Corporation ("Specialty Piping") in April 1981.  Tr., p. 23.[3]  For over 30 years, Specialty Piping provided welding and fabrication services to the chemical industry.  ECF 29, p. 2.  Specialty Piping operated out of a manufacturing facility in Davisville, Wood County, West Virginia (the "Property").  Id.  The real and personal property used by Specialty Piping were owned personally by Romine.  ECF 115, p. 1.  United is secured by the Property based upon a Deed of Trust dated September 19, 2012.  It also has a security interest on certain personal property (equipment and machinery) based upon a Security Agreement dated September 19, 2014.  ECF 59.  The Property secures a loan from United to Specialty Piping made on March 19, 2013 in the principal amount of $1,900,000.00 (the "Loan").  ECF 59.

Specialty Piping defaulted on the Loan in November of 2017.  Tr., p. 44.  Thereafter, Romine decided to sell Specialty Piping.  Tr., pp. 23-24.  United placed the Loan in forbearance in February 2018.  Id. at 44.  The forbearance was set to expire in July 2018.  Id.  The two parties met several times to discuss an extension of the forbearance but ultimately were unable to reach an agreement.  Id. at 46-47.  The last payment received by United was in March 2019 in the approximate amount of $23,000.00.  Id. at 45.  At the hearing in April 2020, Troy Lemasters ("Lemasters"), senior vice president and special asset manager of United, testified that United

---

[2] The Court has reviewed the Transcript and has also listened to the audio recording of the entire hearing.  To the extent Bankruptcy Rule 9028 applies to this case, the Court certifies familiarity with the record and the case may be decided without prejudice to the parties.

[3] References to the Transcript of the hearing, found at ECF 115-1, are hereinafter made as "Tr."

2

was owed $1,760,000.00 of which the approximate principal balance was $1,670,000.00. Tr., pp. 47-48.[4]

Allegedly to facilitate a sale,[5] Romine created the Debtor on September 11, 2019. ECF 59. On the same day, Romine deeded the Property, which was titled in his name individually, to the Debtor. ECF 59, Ex. D. Unaware of the transfer, Lemasters met for a final forbearance extension discussion with Romine on September 23, 2019. Tr., pp. 45-47. Romine did not tell Lemasters about the transfer or the existence of the Debtor at this time. After the parties were unable to reach terms, the Debtor filed a voluntary Chapter 11 petition on November 6, 2019. ECF 1. It was not until after the Chapter 11 filing that the Bank learned of this transfer of the Property to the Debtor. Tr., p. 47.

The Debtor has no employees or income. Tr., pp. 24-26. Romine testified that he had no intention to reorganize. *Id.* at p. 27. The Debtor was formed to sell the collateral, the net proceeds of which would be devoted to pay United's claim. ECF 56, p. 6. The Debtor's schedules list two creditors: a secured claim of $1,700,000.00 held by United and an unsecured claim of $12,000.00 held by the Wood County Sheriff's Office. ECF 26. Notably, the Debtor is not an obligor on any of the debt to United. The Property was deeded to the Debtor, a stranger to the Bank, with the Bank's deed of trust already upon it. United also has a personal guarantee from Romine on the Loan and a security interest in Romine's personal life insurance policy. Tr., p. 51; ECF 26.

---

[4] At the Court's request, given the lag between the time of trial and the undesigned being assigned to the case, the Bank filed a supplemental affidavit advising that as of October 29, 2020, the loan balance was $1,794,688.31, including principal, interest, and fees. The per diem rate of interest is approximately $184.97. ECF 137.
[5] At the evidentiary hearing, Romine explained that extensive pre-bankruptcy issues with former employees had damaged Specialty Piping's tradename and hindered a sale. Tr., pp. 25-28.

According to its schedules, the Debtor's primary asset is the Property. ECF 26. The land is situated on 4.4 acres and the buildings in total contain 37,500 square feet. Tr., p. 69. The site includes an office and a manufacturing facility, which has been used for welding and fabrication work, and has the capability to handle and store large equipment by use of a 5-ton overhead crane. ECF 56, p. 6; Tr., p. 31. The newest building has a three-phase electrical power system, which is a desirable feature for heavy industrial use. Tr., pp. 32, 68. Holmes Paul Shaver, a commercial real estate agent, testified that the Property was fit for other uses such as diesel engine repair. Tr., pp. 18-20. The Property is located within a short drive of Interstate 77. *Id.* at 31. The Property was originally listed for sale in 2017 with an asking price of $2,300,000.00. Tr., pp. 12-13. Thereafter, Romine testified that he received an offer between $1,900,000.00 and $2,100,000.00, but the offer was declined. Tr., p. 28-29. Since then, the Property has been continually on the market and the asking price in April 2020 was reduced to $1,700,000.00.[6] *Id.* at 27-30.

The parties agree that United's collateral must be sold. The parties disagree who should conduct the sale. The Motion asks the Court to dismiss the case for cause, which would allow United to foreclose on the Property pursuant to the loan documents and applicable state law. In its response to the Motion, the Debtor asserts: "It is Mr. Romine's goal and intent to conduct an orderly liquidation of the business," and pay United's claim from the net proceeds. ECF 29, p. 2.

---

[6] United has employed Travis N. Cox, a licensed general appraiser, to appraise the Property on multiple separate occasions. The appraisals were performed between 2014 and 2019. with the Property valued from $1,900,000.00 and $1,500,000.00, the latter being the most recent appraisal. ECF 115, p. 1.

## **CONCLUSIONS OF LAW**

I. **Jurisdiction and Venue**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(a). The Court concludes that this matter is a "core" bankruptcy proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper pursuant to 28 U.S.C. § 1409. The District Court for the Southern District of West Virginia has referred all of the types of proceedings listed in Section 157 to this Court. *See* General Order of Reference dated October 16, 2019 of the United States District Court for the Southern District of West Virginia.

II. **The Applicable Law**

Section 1112(b)(1) of the Bankruptcy Code provides that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause.

11 U.S.C. § 1112(b)(1). Because the Code does not define what constitutes "cause" under Section 1112(b), courts must determine whether discretionary relief is appropriate on a case-by-case basis. Courts have consistently interpreted "for cause" to include the lack of good faith in the debtor's filing. *See Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) ("[A]n implicit prerequisite to the right to file . . . is 'good faith' on the part of the debtor, the absence of which may constitute cause for dismissal…")(citation omitted).

In the Fourth Circuit, courts apply a two-prong test to determine whether cause exists to dismiss a Chapter 11 case for a bad faith filing. *Carolin Corp*, 886 F.2d at 700-01. The purpose of the "twin-pronged inquiry" is to "determine whether the purposes of the Code would be furthered by permitting the Chapter 11 petitioner to proceed past filing." *In re Rain Tree Healthcare of Winston-Salem, LLC*, 585 B.R. 777, 782 (M.D. N.C. 2018). Dismissal is

appropriate when (1) the debtor's reorganization effort is objectively futile; and (2) the debtor's filing was motivated by subjective bad faith. *Carolin Corp.,* 886 F.2d at 700-01.

Whether the debtor filed for relief in good faith is a discretionary determination that turns on the bankruptcy court's evaluation of a multitude of factors. *In re Laguna Assocs. Ltd. P'ship,* 30 F.3d 734, 738 (6th Cir. 1994). A determination of whether this case was filed in subjective bad faith cannot be made on the basis of any one fact but requires this Court to consider the "totality of the circumstances." *Carolin Corp,* 886 F.2d at 701; *In re Kinard*, No. C/A 01-03621-W, 2001 WL 1806039, at *6 (Bankr. D.S.C. Nov. 16, 2001).

While no single factor is dispositive, courts have found the following factors meaningful in evaluating an organizational debtor's good faith:

> 1. The debtor has one asset;
> 2. Secured creditors' liens encumber the asset;
> 3. There are generally no employees except for the principals and there is no ongoing business activity;
> 4. The debtor has little or no cash flow and no available sources of income to sustain a plan of reorganization or make adequate protection payments;
> 5. There are few, if any, unsecured creditors whose claims are relatively small;
> 6. There are allegations of wrongdoing by the debtor or its principals;
> 7. The timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of secured creditors to enforce their rights;
> 8. The debtor is afflicted with the "new debtor's syndrome" . . .;
> 9. There is no realistic possibility of reorganization of the debtor's business;
> 10. The reorganization essentially involves a two-party dispute; and
> 11. Bankruptcy offers the only possibility of forestalling loss of the property.

*Kinard,* at *6; *In re Dunes Hotel Assocs.*, 188 B.R. 162, 171-2 (D. S.C. 1995). The Debtor here exhibits nearly all of these factors.[7]

This is essentially a one-asset case. Although the Debtor does have some equipment and machinery, the Debtor's primary asset, by a wide margin, is its real property. The Debtor's

---

[7] There is no evidence of wrongdoing by the Debtor or its principals.

Schedule A/B values the real property at $1,800,000.00 and the personal property at $205,850.00.  ECF 26, pp. 5-6.  United holds liens on both.[8]  ECF 27, pp. 2-3.  This is a two-party dispute, with only one other – relatively small – creditor.

The Debtor has no employees, and no ongoing business activity. The Debtor has no cash flow and, other than contributions from its principal, no available sources of income to sustain a plan of reorganization. If adequate protection payments are able to be made, there was no evidence they have been offered.[9]

The timing of the Debtor's filing evidences an intent to forestall foreclosure by United as the forbearance period had expired and was not extended.  The Debtor is a "new debtor," formed specifically to take title to the property and hold it while the Debtor filed Chapter 11. Bankruptcy was the only option to forestall imminent loss.

United is owed not less than $1,794,688.31, and interest continues to accrue at the rate of approximately $184.97 per day.  ECF 137.  After being on the market for three years, the Debtor's real estate is currently listed for sale at $1,700,000.00.  Tr., p. 28.  The Debtor also listed United's claim at $1,700,000.00.  ECF 26.  The Bank's most recent appraisal lists the real property as having a value of $1,500,000.00, although it was appraised by the same appraiser in 2017 for $1,900,000.00.  In the aggregate, these factors indicate an objectively futile reorganization effort.  Accordingly, the first prong of *Carolin* test is satisfied.

Addressing *Carolin*'s second prong, the subjective bad faith inquiry asks whether the Debtor actually intends "to use the provisions of Chapter 11 . . . to reorganize or rehabilitate an

---

[8] The real estate is secured by a Deed of Trust dated September 19, 2012 and the personal property is subject to a Commercial Security Agreement dated September 19, 2014.
[9] While the hearing transcript did indicate that Romine had some additional real estate (used by a local school as a ballfield) that he was willing to pledge to the Bank as additional collateral, there was no indication of the value of this property.

existing enterprise, or to preserve going concern values of a viable or existing business." *Carolin Corp.*, 886 F.2d at 702 (citation omitted). The inquiry is often stated as whether the real motivation for the bankruptcy filing is "to abuse the reorganization process" and "to cause hardship or to delay creditors . . . without an intent or ability to reorganize." *Id.* (citation omitted)*; See also, In re MacInnis*, 235 B.R. 255, 261 (S.D. N.Y. 1998) (debtor must have some intention of rehabilitation when seeking protection of bankruptcy).

There is no "going concern" to preserve or rehabilitate here. The Debtor has no employees or cash flow. *See 15375 Memorial Corp. v. Bepco, L.P.*, 589 F.3d 605, 619 (3d Cir. 2009) (acknowledging there was no "going concern" where debtor had "no employees, offices, or business other than the handling of litigation"). At the evidentiary hearing, Romine acknowledged that he never had any intention to run the Debtor as a business or to reorganize it. Tr., pp. 26-27. From its inception, the Debtor has been a vehicle to sell the Property on what the Debtor hoped would be more favorable terms. *Id.* at 26.

This Loan has been in payment default since 2017. Tr., p. 44. United negotiated with Specialty Piping and Romine on a forbearance extension since at least mid-2018. Tr., p. 43. Amid these negotiations, Romine created the Debtor and—without notifying United— transferred the encumbered collateral, which in and of itself was an event of default under the loan documents.[10] United did not even learn that title to its collateral had been transferred until November 2019. Tr., p. 47. A commercial real estate agent, Holmes Paul Shaver, who had the listing from August 2017 to September 2018, testified the property was listed at $2,300,000.00, and then reduced to $2,100,000.00, and no offers were made during that time. Romine testified

---

[10] See Commercial Line of Credit Renewal Agreement and Note and Deed of Trust attached to Stipulation. The transfer of the Property without the Bank's consent is an event of default under the deed of trust, which in turn is an event of default under the note.

that he received no offers that he would accept, but he believed he received an offer of between $1,900,000.00 and $2,100,000.00 on the Property. Yet, he never conveyed that offer to the Bank. He could not even remember who made the offer, and the Court finds that testimony neither credible nor persuasive. Romine further testified the Property was on the market at the time of the hearing for $1,700,000.00, which is less than the Bank's payoff.

Chapter 11 cases are subject to dismissal if commenced primarily to obtain a tactical litigation advantage. *See Carolin Corp.*, 886 F.2d at 705 (lack of good faith exists when the "purpose of a Chapter 11 debtor is to hold a single asset 'hostage' in order to speculate that such asset may increase in value [leading] to recover[y of the] original investment at the creditor's risk")(citing *In re American Property Corp.*, 44 B.R. 180, 182 (M.D. Fla. 1984)). The strategic timing of the Debtor's filing—two months after its formation, and concurrently with the failed forbearance negotiations—along with the failure to apprise the Bank of the transfer, indicates sufficient bad faith to meet subjective bad faith under *Carolin*.[11]

Therefore, the Court will dismiss the case.

## **CONCLUSION**

For the foregoing reasons, United Bank's Motion is granted, and the Debtor's Chapter 11 case will be dismissed by a separate Order to be issued contemporaneously herewith.

---

[11] The Court also notes that the Debtor proposes to employ a realtor to sell the real property at a price of $1,900,000.00, with a 6% commission. ECF 9. A full price contract on the real estate would realize net proceeds to the Bank of $1,786,000.00, which is less than its current payoff. Moreover, this proposed listing price is $200,000.00 more than the property is currently offered for sale based on Romine's own testimony. Tr., pp. 27-28.